Good morning, Your Honors. My name is Lawrence Shonbrun. I represent Appellant Marty Evans. On a procedural point, Your Honor, before we begin, the appellants have divided argument in this case between attorneys' fees and settlement issues. I am going to be handling the attorneys' fees argument, and Mr. D'Aria is going to be handling the settlement issues. We've arranged that I'm going to speak first, but if you would prefer to hear settlement argument before attorneys' fees, then he can. No, just proceed. How much time are you taking? I'm going to take – I'll add 10 minutes, and I'm going to save 2 minutes for rebuttal. All right. Thank you. Good morning, Your Honors. I want to thank you for the opportunity to discuss with you what I think are some very important issues on the awarding of attorneys' fees in class actions. I intend to cover five points regarding the district court's attorneys' fee award. The first is the failure of the district court to follow this court's instructions in Six Mexican Workers and Whoops regarding information on lodestar hours. The second argument will be the court's selection of the 25 percent benchmark in light of all the facts and circumstances of this case. The third point, the district court's use of the percentage of the recovery approach rather than the lodestar multiplier approach on the facts of this case. The next fourth point, the district court's application of common fund principles in awarding attorneys' fees under this case. And finally, the district court's calculation of the percentage, not based upon actual money returned to the class, but rather on amount available to the class, and I think around 40 percent of which wound up being returned to the defendant. Your Honor, as regards the instructions of this ---- Is that the reversion clause? Your last point? Yeah, my ---- no, no. That's not the reversion clause. That's a settlement provision that the settlement argument will include. Your Honor, this Court in Six Mexican Workers restated in Whoops, before ---- excuse me ---- before a percentage award can be made in a class action, attorneys' fee circumstance, the district court, and the words are, must ensure that the fee is not excessive in light of the hours devoted to the case. In this case, the district court made no effort and made no determination, in fact, didn't want to hear about how many hours were actually devoted to the case. She ignored that issue completely. She ---- the justification for that refusal was the Vizcaíno case, but the Vizcaíno case, if you read it, is a case in which the court did do a lodestar crosscheck before making a percentage award. So Vizcaíno does not support what the court did, and I don't think there's any justification in the record for the court to have just refused to follow the instructions of Six Mexican Workers and Whoops. The second issue, Your Honor, concerns the district court's awarding of a 25 percent benchmark. This award is also in contradiction to the Whoops decision, which talks about there are no fixed percentage awards in class actions, that it depends on the facts of the case, and that all the facts of the case must be considered. The district court in this case ignored all the factors which should have mitigated a 25 percent award. When I say ignored, I mean ignored in her fee calculation. She recognized there was little work done on the case, no formal discovery, the case was settled before it was filed, no motion for this, no motion for that. She recognized those factors, but totally ignored all of those factors in terms of deciding to pick a 25 percent. You know, it just seems that this is pretty an extraordinary case where, you know, in effect the plaintiffs got out by the skin of their teeth, if you will, because of the chain, you know, because of the subsequent ruling that the members of this class might not have been entitled to anything. That's a ‑‑ it seems to me that if you read this, one way to read the fee calculation is you look at all of the what I'll call the standard criteria, but then you have this extraordinary situation here, which I'm not ‑‑ I haven't seen that happen before. Why isn't that enough, you know, weighed into the big basket of factors to justify that percentage? It's not enough because these other factors that mitigate the 25 percent, the use of 25 percent, were in this case, there was this one, as you say, extraordinary fact, but the ‑‑ for example, the Wooks decision, the Court has said percentages are rough and ready calculations. The two issues are risk and effort. We have to look. I think the district court is bound to look. Here they added in a third factor, risk, effort, and time. Risk, effort, and time, exactly. Risk, effort, and time. But I think time is the cross ‑‑ time is kind of the cross check against risk and effort. The percentage ‑‑ the use of percentage as opposed to Lodestar is risk and effort, and then when you've got that percentage, then you look at time to see whether or not the percentage is out of whack. And clearly the Court could make this a factor, plaintiffs cut out by the skin of their teeth, but that doesn't undermine the amount of effort that was put into the case. It doesn't undermine the fact that the case was settled, and therefore the risk minimal. It doesn't undermine, and all those factors don't just eliminate themselves because we have an unusual case of a ‑‑ You observed that it was settled before it was filed. How do we know that? When was it settled? I believe that the record is clear that while the Bowman case was being settled, which was the California, limited to California class members, while the Bowman case was being settled, those discussions also included a class that would involve everybody else except California. And when you say it was settled, was it actually settled or just talked about? No, no, certainly talked about settlement. Discussion of settlement, and that's prompted the case to be filed. And now if you prevail, what would happen? Well, you mean in terms of the settlement or the fees? No, the fees. If I ‑‑ We didn't disturb the settlement. If you prevailed, Mulhoney would go to UBS, correct? If I prevail, the fee will be recalculated by the court, and then ‑‑ Yes. I understand. I think the point you're making ‑‑ And if we leave in effect the reversion clause, UBS will get more money. If you leave the reversion clause, not necessarily. I believe that class members will go ‑‑ have the right to go back to the district court at the time of the fee recalculation and argue under the Manual for Complex Litigation that the court should treat this attorney's fee as a part of the class recovery. I don't see why. If we leave in place something that's been decided, that's the end of it. There's not going to be more litigation over that. Well, anyway, that's your problem. I don't know who you are. I mean, you've got to win on both points to get any money for the class. Well, I would ‑‑ the point I would ‑‑ my response to that would be that it is not the case that the only criteria to decide whether or not an attorney has been overpaid on a fee is whether or not the fee, the overpayment, will be returned to the class members. No, that's not the criteria. I'm just pointing out your problem. It's like a sort of a pyrrhic victory, you know. So let's ‑‑ yeah. He's not saying that that's the criteria for overturning it, but if you overturn it, where does it get you? I would just say to you, Your Honor, in terms of ‑‑ And that's not our problem, but we do have ‑‑ It's your problem. It's your issue, but we're trying to understand it. In terms of the class action mechanism and in terms of class members and class actions, it would not be a pyrrhic victory at all. Whether or not it's going to put 5 more cents or 12 cents in the pocket of every class member is really a ‑‑ It would be zero cents. So, anyway, let's not argue it. You don't see what we're saying. Anyway, you've used 10 minutes of your time already, so. Oh, I have? You have. Okay. Good morning, Your Honors. My name is John Halabian, Lovell Stewart Halabian. I represent Anthony Daria, one of the appellants. I first would like to thank the panel for being the very first court during this entire litigation that is giving my client the opportunity to actually be heard and have his arguments heard in a court, something that was repeatedly denied to him by the lower court. So you really got to justify your position here to begin with. Well, Your Honor, let me ‑‑ I'm going to start with something that I didn't intend to start with, but I can see the panel is interested in this DOL letter. And let me say this. The effect of the DOL letter is way overstated. It was procured by the Securities Industry Association, which is the organization of brokerage firms of which UBS is one of the charter members. They represented in the letter that it was not being sought in connection with pending litigation when, in fact, it was being sought in connection with pending litigation. Much of what the defendant said looked bad for the plaintiffs was that a few years ago, when there was still a Republican administration, it looked like things were going to be bleak. Obviously, that's changing big time, that Congress is right now passing a law that is basically going to throw out a Supreme Court decision that just occurred a few months ago about discrimination and statute of limitations. So this idea, this idea that this DOL letter is a showstopper is just wrong. In fact, there have been other cases, similar cases, that have been getting settled where this DOL letter has not been putting the dent into them that anybody would ever think. It's not insignificant. What isn't insignificant? It's not the letter is not insignificant. I didn't put it in there. Anyway, would you tell us why, when you filed late, you have any right to intervene at all? Because, Your Honor, we didn't really file late. Mr. Kaufman filed a timely, a timely objection and a timely motion to intervene. And behind the back of his lawyers, UBS and their counsel literally bribed him to withdraw an objection and withdraw motion papers and literally lie to his lawyers and lead his lawyers along for weeks. You're sort of speculating when you say all that, aren't you? What? I'm sorry? You're speculating when you say all that. You don't have that in the record. Oh, absolutely. It's in the record. Absolutely. We have sworn testimony in the record that several days after Mr. Kaufman filed his objection in September, that UBS went to him and sought to basically pay him off and have him withdraw his objection. Is that a bribe? I'm sorry? You could, didn't you call it a bribe? It's a bribe. It's absolutely a bribe. Because he had a responsibility to his lawyers who were seeking to act as putative class counsel. He was a putative class representative. He had a responsibility to his lawyers? Your Honor, every client has a responsibility not to lie to his lawyer. You represented Mr. Kaufman, is that correct? We initially were representing Mr. Kaufman. When Mr. Kaufman literally got paid off to go away, Mr. Darius sought to step into his shoes, which is something that happens all the time, Your Honor, in cases where one client may blow up in a class action. Usually the courts want to see the class get the best representation, and they're usually accommodating about that. I don't want to waste your time, but what's the problem with the argument is that you have to assume that we're going to assume certain things in deciding this case, and we're going to decide on the record. And it's not at all unusual that somebody negotiates with a person who's brought a claim. And the person who didn't bring the claim may be at fault, because the person who didn't bring the claim had the opportunity to do so, and he knows that he's relying on a thin reed, because the person who brought the claim can always settle. Your Honor, what's unusual about it is you're absolutely correct. But here, they went around the back. The client secretly lied to his counsel and led us to believe that he wanted to continue seeking, basically seeking to represent the interests of the class. He had us putting papers in on his behalf at the same time he had already cut a deal. It was basically a fraud on our firm to keep us or our other clients from making a timely objection, and all that information's in the record. We have sworn testimony that the client lied to us. The only reason I'm smiling is because the law gives a remedy when that is a fact. Well, here, Your Honor, the damage was done to the class and to the settlement approval process, not just to some individual. The whole settlement approval process was corrupted by someone doing an end run, literally paying someone off to prevent the very problems that were being raised in this case from ever being heard. This Court, this Court and the lower court in Rule 23 class actions have a fiduciary obligation to safeguard the interests of absent class members. That isn't to sweep problems under the rug and not ask questions about them. When this – when these issues came up, this Court should have asked some questions to see what's going on here. Why is – you know, who's paying who off to do what, and how does this impact the entire process of absent class members? It was a very unusual thing, and I can't imagine how any court could allow something like that to go forward, asking some questions and having some semblance of protecting the integrity of the process. I see I'm over time. Thank you. Thank you. Your Honor, my name is Kirby Wilcox, and I represent UBS in this proceeding. Mr. Wilcox, we never got to it from – with the – because there were so many other problems. But let me tell you frankly, the most interesting and the most difficult aspect of this settlement is the reversion, because that seemed rather unusual, and the effect, as you can see, was to kind of take out who was going to object if the money was going to go back to UBS. So how do you justify that clause? Your Honor, a reversion clause is common in the resolution of wage and hour class actions. Of the hundreds that I have settled, I could not count on one hand those that are not reversionary. Is that somewhere on your brief, or? Let's focus on this case and to your question. No, but do you make some reference to that? I don't make reference to my prior settlements in the record, Your Honor. The direct answer to your question is that it is fair in this case because UBS placed itself at risk to make payment to every class member were they to step forward. We were prepared fully to pay 100 percent of the class if they presented themselves. In the negotiation, we determined what we believed was a fair payment to each class member. If they did not present themselves, no other person was entitled to an enhanced payment having determined in the mediation what was fair to pay to each individual. So the reversion does not overpay a class member. It resolves the case in a manner that's fully fair because having determined individual amounts, having placed ourselves at risk to pay them, everyone who did come forward received their money. No one was shorted by a single penny. Those who did not present themselves did not receive any payment. But the reversion did not benefit anyone. It was a complete and faithful payout of the amount that we'd agreed. Would you go back to the payment to individual class members? Those were individually calculated? Each person had a known number of months that they worked for the company. Each month was given a value depending upon the state in which they worked. $120 for three states and $75 for the remaining states. So each person had a precisely calculable and known sum. And when they presented themselves for that payment, they received it. So it really was an individualized, negotiated settlement? The settlement was an aggregated in terms of what would be paid. Correct, Your Honor. We did not, because the class was over 13,000, what we negotiated was a payment that we believed, given the push and pull of a mediation, fairly compensated these individuals for their claims. The month-by-month calculation method, in effect, resulted in precisely calculable individual payments, because each person had a known number of months that they worked for the employer. Do you know now how much has gone back or will go back to UBS? It would be, we are distributing, we are prepared to distribute 63 percent of the sum available to the class. Without a calculator in front of me, Your Honor, what we do is take 45 million, we subtract the fees, we subtract the $100,000 for enhancements, and we subtract what will be approximately $182,000 to the claims administrator. Of that residual, Your Honor, 63 percent will be distributed and the remainder would return to UBS. I don't know that number, but that's the method. Well, what, 60 percent of roughly 30 million, is that about, I mean, I'm giving very small pie calculations, but roughly 30 million is going to the class? Roughly. And then 60 percent is actually going to, so 18 million goes to the class and 11 million goes to the lawyers? Is that the way it works or not? And 18 million is going to the class. Now, how much goes to the lawyers? The attorney's fees for class counsel are 11.5 million. So, I mean, is that right? 11 goes to the lawyers and 18 to the class? I don't have the precise. No, I know. Yes, but yes, correct, Your Honor. That is, that. It's a striking. The logic of your question is precisely correct. It's a striking relationship. Well, Your Honor, I think it's important that at the time that this case was settled, it was the most legally complicated of my career. There have been accusations in the record that the parties gave short shrift and little time to the questions at issue. I don't want to belittle the efforts that it took to gather the facts because it took some time to identify all of the class members and their work months and the amounts of their pay. But the effort that we undertook to gather the facts was as simple as raking leaves to put the facts in the hands of opposing counsel, class counsel, than the legal issues. Across 50 states, Your Honor, there is not a body of law regarding reimbursements and expense deductions. There are states with no law. There are states with ambiguous law. There are states with ambiguous law ambiguously interpreted. I had never encountered such a difficult body of law to analyze. Never. Well, let me ask you about the attorney's fees. Typically, the Lodestar is used as a check, and we don't have that here. Is that correct? You don't have that check here, Your Honor. Why not? The district court did not request Lodestar information for the evaluation. And, Your Honor, from the perspective of UBS, although we understand from a question earlier posed that if this is remanded and fees are not paid, they will go to UBS. We are urging, UBS is urging, that the fee provisions be upheld. No, we understand that. That aside, we have an obligation, independent of where the money is going to go, to determine if the fees are fair and reasonable, which is what the district court was supposed to do. It just seems very odd in a case of this magnitude, and given the state of the law, that you wouldn't have the Lodestar benchmark. I mean, you've explained how complicated the law is and time spent. I mean, and take that all as a given, why wouldn't the why isn't it reasonable under our law? And why wouldn't it be an abuse of discretion not to get the benchmark? Your Honor, I will answer that question. But because I've agreed to share my time with the other appellee. Oh, we didn't realize that. Excuse me, Your Honor. We were agreed to split it in half, and I've already exceeded my half. You can answer that question if you'd like. Thank you. Well, Your Honor, I would say that as a public policy reason, because the facts were not difficult to gather, if there were a Lodestar check, then UBS is concerned for itself and for the development of the law that any contrary decision might create an incentive to run up fees to have a Lodestar available when, in fact, the class was. Well, you know, let me just stop there. You could have a low Lodestar, and the judge could say, well, you know, this is the kind of case where you have, you know, I'm still going to award these larger fees. But it's a significant piece of information. You're just jumping to conclusions that with a low Lodestar that the result would change the ultimate result. It might not. And it might not. It might not. I understand. Thank you, Your Honor. Your Honor, Michael Rubin for the plaintiffs. I hope I am able to have the seven and a half minutes that I had asked to respond to the Court's questions about fees, and I'd like to address. Just as a preliminary thing, if you're going to split time, it's best to tell us. Because we can't, after the fact, figure out your time split. We didn't know. I understand. I apologize. We did discuss it with the clerk beforehand. I apologize, Your Honor. I want to make three points. First is a matter of arithmetic. Second is a matter of law. And third is the discussion of this Lodestar crosscheck. First is a matter of arithmetic. Judge Noonan, while your numbers are a little off in terms of the allocation, it's actually closer to $20 million for the class. And there's also notice provisions. This settlement also included, and the record shows, prospective relief that was valued at between $8 to $10 million per year. As you'll see in the transcript of the fairness hearing at DER 553 to 54, and in the fees brief in the joint supplemental excerpts at 114 to 125, as part of the settlement negotiations, UBS agreed on a going forward basis no longer to continue the two practices that were at the heart of the deduction claim. The first one was worth approximately $3 million a year. The second was worth between $5 to $7 million a year going forward. So under the what were they? First of all, they would no longer deduct for trade errors. That's $3 million a year. Secondly, UBS agreed that it would essentially guarantee the draw and not pull money from future commissions in order to square the draw amounts. That is in the record at both those places. That was part of the agreement between counsel. And at the fairness hearing, a representation was made to Judge Chesney that those changes had already gone into effect and they are still in effect today. So in fact, the value of the settlement to the class or to the current members of the class greatly exceeds $45 million. You have to add $8 to $10 million per year for that. Now, what is the legal significance of that? Well, you look to Staten v. Boeing. This court in Staten v. Boeing said that in a common fund case where there is injunctive relief, there are two things that you can do. First of all, if it is an ascertainable amount, which it is in this case, although it wasn't in Staten, if it's an ascertainable amount, you can add that to the common fund to in fact conclude that the common fund total is higher. Alternatively, you could keep the common fund at the total payout and increase the percentage above the 25 percent amount. So because of the additional benefits to the class here, there is yet further reason to support what Judge Chesney did as well within her discretion. And that brings me to the legal point. Legally, obviously the standard here is whether her fee decision was an abuse of discretion. And that, to find an abuse of discretion, it would be the objector's burden either to show an erroneous conclusion of law or that there is no evidence on which she rationally could have based her decision. That's the standard set forth in both Hanlon and in Hill. Now, what is the law about the reversion that we've been talking about? Well, the law is very straightforward that the type of settlement that Mr. Wilcox described is in fact common in wage and hour cases is permissible in class action settlements where a common fund is applied. Reversion, as this Court held in not only in Judge Farris' Six Mexican Workers case, but in the follow-up case of Williams v. MGM Path Communications, is perfectly permissible and promotes the interest of settlement of these complex class actions. Now, at the trial court, at the fairness hearing, the very start of Mr. Schonbrunn's argument to Judge Chesney, and that is in the record as well, he started by saying, the first thing I want to tell you is that the Williams decision of the Ninth Circuit is incorrect. That's at Daria's excerpts of record at page 569. The first point I make is I believe Williams is an incorrect decision. She, Judge Chesney, did not abuse her discretion by accepting a reversionary settlement, by accepting a common fund benchmark percentage that permitted any unawarded money to revert to the defendant, UBS, because she followed this circuit's law as she was required to do. While objectors have stated a disagreement without any with the Ninth Circuit's current law, well-established law, in a series of cases, including another securities case that Judge Farris did, as well as the Staten case, as well as the Grouty case, in fact, the objectors have never articulated any reason, basis why those cases are wrong. I can explain why those cases are right. That's not my burden. My burden is simply to show that she did not, Judge Chesney, did not abuse her discretion because she followed the law as it was written and she evaluated the case as she was in the best position to do so, bearing in mind. Why wasn't you're running out of time, so when I get to my question, why wasn't it an abuse of discretion not to have the facts? Three reasons. Do you want me to finish my question or do you want to answer it? Not to have a check that is in our case law and particularly in a case like this where the time spent, it's nothing like some of these other cases, Hanlon or Piscaeno or some of the other cases we've had. Go ahead. Three reasons. First, she did say that she is proceeding on the assumption that the load star is about a, based on what she saw, was about a tenth of what the amount she awarded would be. So she did a rough load star cross check and she concluded that had she applied the load star method, which she had the right to do, it would require application of a multiplier of about 10.0. Second, while the cases say that a load star is permissible, there is not a single Ninth Circuit case that requires load star cross check. In fact, what the cases say that it is up to the trial court's discretion based on their assessment of what would be appropriate under the circumstances of the case, whether to apply the percentage method or the load star method. Third, in this case, she chose to apply the percentage method after having this very same discussion with counsel for objectors as to which would be appropriate and why, after saying this is about a 10.0 multiplier, because of the unusual circumstances of this case having been resolved through informal discovery among very experienced wage and hour counsel who had dealt with these issues before in a rapidly changing area of law where the result that was accomplished for the class, according to Judge Chesney and her specific findings, was, quote, exceptional and excellent and was only accomplished because, recognizing that uncertainty and the trends in the area, plaintiff's counsel was able to negotiate an extraordinarily favorable resolution in an extraordinarily brief period of time. Had she applied the cross-check method, which we contend she did, she would have concluded, as, in fact, she must have, that a load star plus multiplier of 10 was, in fact, supported the results she reached because she went through that analysis because, in this case, to apply the 25% benchmark accomplishes every single objective of the percentage basis of calculating. It aligns the interests of class and counsel. It avoids unnecessary litigation and squabbling just to run up the hours. It replicates the way lawyers are paid in the market where they have percentage fee agreements at the outset. If you had asked at the outset what is the best way to resolve this, how would this be resolved in the market, counsel probably would have done what counsel usually do, which is say, we'll take a percentage of this case. It's a risky case. The law is in a state of flux, but we think, class, we can get you something. New York members of the class got $10,000 each if they were there for the full period covered. This was an extraordinarily favorable settlement. It wouldn't have happened if counsel spent more time litigating it traditionally. This was a creative resolution. All right, thank you. Thank you. Is there somewhere in the record in her discussion with Loza? Yes, Your Honor. And I don't have that here, but I will present it to you. It is in the excerpts of record. It's in the excerpt. That's fine. We'll find that. Thank you, Your Honor. We'll find that. Thank you. Thank you. If you find it before you leave, you can write it. The clerk has some pieces of paper. You can write it on one of those supplemental authorities, but otherwise we'll ferret it out. I'm going to give you two minutes for rebuttal because we gave them some five minutes. We had a lot of questions. If the clerk would give him two minutes, please. I'm going to try New York minutes and speak very quickly. First of all, what the Court said was 10 or more multiplier. She said a multiplier of 10 or more, not 10. So she didn't know what the multiplier is, number one. Number two, there's no excuse. The law requires in this circuit that the Court has to know Lodestar hours. It's not a guessing game. Number three, the Williams case wouldn't exist after the PSLRA. The Williams case says you don't consider how much money the class actually takes. It was because of cases like Williams that the Congress and the PSLRA changed the law with regard to fees, saying that fees have to be based upon the amount of money actually claimed by the class. Williams is not good law. It shouldn't have existed when it was written, but it clearly is not good law now. Reversion. This is a reversion. It's not a common fund. If you read Staten v. Boeing, this is not a common fund case. When money goes back to the defendant, it's not a common fund. If I can read to you from Boeing v. Van Gemert, a case they all cite in support of this. Nothing in the Court's order made Boeing's liability for the amount contingent upon the presentation of individual claims. Thus, we need not decide whether a class action judgment that simply requires the defendant to give security against all potential claims would support a recovery of attorney's fees under the common fund doctrine. It's never been decided this is not a common fund. This is a separate payment of attorney fees by a defendant through a reversionary settlement, and there... Let me say two other things. In terms of running up fees, the defendant even says he supports this settlement because otherwise lawyers are going to run up their fees. I would just say to you, in terms of judges in charge of attorneys, the way to stop lawyers from, quote, running up fees in cases is not to overpay them for what it is they're doing and then not ask any questions about how much time they put into the case so you don't know, so you never know how excessive the fee is. That's the wrong solution to this problem. The lodestar multiplier is the right solution. What's the multiplier for? If this judge thought the case was settled quickly, if she thought whoever got a good deal, then she can take a multiplier of whatever the lodestar was. That's one of the factors the multiplier uses. You don't use a percentage approach, a benchmark percentage, and then not ask any questions about time. It's contrary to the laws of this circuit. Thank you. I thank all counsel for argument this morning. The case just argued, Daria v. UBS is submitted.
judges: Farris, Noonan, McKeown